EMPLOYERS MUTUAL CASUALTY COMPANY OF DES MOINES, IOWA, Appellant,

v.

William Martin NELSON, Appellee.

No. 13789.

Court of Civil Appeals of Texas.

Houston.

Oct. 26, 1961.

Rehearing Denied Nov. 16, 1961.

Chilton Bryan, E. H. Patton, Jr., Julietta Jarvis, Houston, Bryan & Patton, Houston, of counsel, for appellant.

Blakeley & Williams, Carey Williams, Houston, for appellee.

WERLEIN, Justice.

Appellee, William Martin Nelson, brought this suit on an insurance policy issued by appellant to recover for damage to his home allegedly caused by the loss of ground support resulting from vibration and slippage of sand through pilings when F. & C. Engineering Company was constructing a storm sewer in the street on which his home fronts. Judgment was entered for appellee on the jury verdict in the sum of $5,800.

■ Appellant asserts that its policy excludes "Loss occasioned by enforcement of any local or state ordinance or law regulating the construction, repair or demolition of building(s) or structure(s)," and that since any damage to appellee resulted from enforcement of the ordinance of the City of Houston in connection with the construction of the storm sewer, the court erred in overruling its motion for an instructed verdict.

We do not agree. The enforcement of the ordinance in question would not necessarily or in the normal course of events have resulted in trespass or damage to appellee's property or an invasion of his property rights. Such ordinance does not attempt to regulate the construction, repair or demolition of any building or structure on appellee's land or any building or structure on any adjoining property that would necessarily affect appellee's property if the work was properly done in accordance with the terms of the contract authorized by the ordinance. There is evidence that the contractor in performance of the construction work, and in violation of city law, used what is called a "headache ball" in breaking up the concrete pavement in front of appellee's home in preparing to excavate, thereby creating tremendous vibrations, and that in violation of specifications included in the contract, which was authorized by and entered into pursuant to the ordinance, trespassed upon appellee's land. This case is distinguishable from the cases cited by appellant in which the plaintiff's property was destroyed as a result of an order of civil authority in the exercise of governmental or police power, without any intervening cause. In the instant case, the loss was not caused by enforcement of the ordinance. The evidence indicates it was probably caused by improper performance of the contract.

■ When appellant's counsel was examining appellee, he brought out that appellee was suing F. & C. Engineering Company for the same loss he was suing appellant for. The following occurred:

"Q. That is exactly the same thing you are now claiming against this insurance company, isn't it?

"The Court: Can't you stipulate what happened?

"Mr. Williams: Yes, sir, the same damage. I don't know it is exactly the same but we will be glad to stipulate and further stipulate that anything they pay us is subrogated to the company issuing the policy.

"Mr. Bryan: Your Honor, in view of that remark it is irrelevant and immaterial, it is prejudicial and inflammatory.

"Mr. Williams: It is in the policy.

"Mr. Bryan: May I make an objection without being interrupted, your Honor, and in view of that remark I move the Court to declare a mistrial and discharge the jury.

"The Court: I will over-rule your motion."

At several points in jury argument counsel for appellee stated in effect that any amount appellee collected could be recovered back by appellant from F. & C. Engineering Company if it was their fault and appellant could prove that said company caused the damage.

We do not think the statement made relative to subrogation or the argument to like effect constitutes reversible error. The statement and argument were invited by counsel for appellant by undertaking to prove that appellee had two suits for the same damage, thereby implying that appellee was seeking a double recovery. Furthermore, the policy of insurance which was admitted in evidence expressly provides for subrogation as follows:

"The Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company. The insured may not, except it be in writing executed prior to the loss, waive his right of recovery from any party."

■ Appellant complains that the court erred in overruling its motion for mistrial because of improper argument of appellee's counsel. Appellee's counsel stated that appellee would have to get a willing buyer in order to sell for cash—"He can't get a loan." On objection of appellant, the court promptly instructed the jury not to consider the remark of counsel. Appellant's witness, J. B. Dannenbaum, testified as to some of the minimum construction standards of the F. H. A., and also that it would be a reasonable assumption that the F. H. A. would not make a loan on homes that do not meet those standards. We need not decide whether counsel's remark constituted a reasonable inference from such testimony because we are of the opinion that no harm resulted from the argument in view of the court's instruction.

■ At one point appellee's counsel made the following argument:

"He has paid his premium for ten years. Now, here, whenever they are called upon to pay for whatever damage has occurred, we just ask that they be made to do it. I wish that I could cancel my—if I am going to have to face these sort of things, I would like to cancel my policy tomorrow, but I can't do it."

The court promptly sustained appellant's objection and instructed the jury not to consider what counsel said he would do with his policy. In view of the court's instruction, we do not think that appellant has shown harm.

■ Appellant next complains that the court erred in permitting appellee's counsel to argue matters outside the record. With respect to counsel's argument that Mr. Dannenbaum had not seen the trench down "here on Penwood," the record shows that Mr. Dannenbaum testified that when he made his initial investigation, the contractor was pulling piling and putting in backfill toward the far end of the street, and according to his memory, the trench was open

for perhaps 250 to 300 feet towards Wayside. Appellee's Exhibit No. 3 indicates that his house was more than 300 feet from Wayside. Thus it seems the argument of appellee's counsel was probably within the record but if we are mistaken, his statement to the jury when objection was made, that if his recollection at any time differed from theirs they would be guided by what they remembered and not take it from him, eliminated any possible harm.

■ With respect to counsel's argument that Mr. Seaman appraised the house as being worth $10,800, the record shows that the witness testified the market value of the home was $10,800. On cross-examination he valued the house at $8,500 and the lawn, shell for the driveway, grading and landscaping at $2,250. We think there is little merit in appellant's contention that appellee's counsel was outside the record in such connection. In any event, no harm resulted to appellant since its counsel included in his objection the statement that the appraised value of the house was $8,500, and the court instructed the jury to take into consideration only what is in the record.

■ The improper remark of appellee's counsel, "Your Honor, we don't have any money left for any more engineering expense," was probably justified by the statement of appellant's counsel, that they would have no objection to Mr. Dannenbaum measuring appellee's house if appellee was prepared to pay him his professional fees for a full investigation. Moreover, the court promptly instructed the jury not to consider the remark.

■ We think the following argument possibly passed the point of propriety:

"Now, then, we get down to Mr. Bryan here, this big lawyer. He is a prosperous attorney. We are talking about the cost involved here on evidence and that sort of thing. No, I withdraw that statement.

"Mr. Bryan, who is a big lawyer, prosperous, smart; he is capable, he is sly, he is foxy and he is cunning. I will have to respect him for his ability if nothing else, but at any rate, we only have one Clilton Bryan, and we are not going to run into all this every time."

Such argument was not of the incurable type and no objection was made to it.

■ We have read not only the argument of appellee's counsel but the entire statement of facts. We cannot say in the light of the whole record that any of the arguments complained of or the cumulative effect thereof were reasonably calculated to cause and probably did cause the rendition of an improper verdict and judgment. Rule 434, Texas Rules of Civil Procedure; Lumbermen's Lloyd's v. Loper, Tex.Sup. 1954, 153 Tex. 404, 269 S.W.2d 367; Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596 (1953); Texas General Indemnity Company v. Bledsoe, 344 S.W.2d 527, Tex.Civ.App.1961, error ref., n. r. e.; Higginbotham v. O'Keeffe, 340 S.W.2d 350, Tex.Civ.App.1960, writ ref., n. r. e.; Murchison v. Qualls, Tex. Civ.App., 294 S.W.2d 296, writ ref., n. r. e.; 3 McDonald, Texas Civil Practice, § 13.05, p. 1186.

In his amended petition filed May 10, 1960, appellee alleged that the contractor began construction of the storm sewer on or about June 24, 1957. It is not alleged nor does the evidence show when the alleged damage was complete or ceased developing. Formal proof of loss was not filed until June 22, 1960. Appellee alleged that all conditions precedent to appellant's liability under the policy had been performed or had been waived by appellant or appellant was estopped to assert the same. Appellee also pled that appellant had expressly and impliedly waived the requirement of a formal sworn statement of proof of loss and that its agents had examined the prem-

ises, and were aware of the nature and extent of the loss.

Since no issues on waiver or estoppel were submitted, the question before us is whether as a matter of law appellant waived the filing of proof of loss or was estopped to assert failure to file the same at an earlier date than filed. Appellee's Exhibit No. 31 addressed to appellee and several other property owners reads as follows:

"R. Beach Mott & Co.

National

Association

Independent

Insurance

Adjusters

Adjusters, Investigators & Surveyors
for Insurance Companies
602 Sul Ross at Jack
JAckson 9–3511
Houston 6, Texas
September 16th, 1957

To: Mr. Wm. Martin Nelson
Mr. Robert W. Otteson & Wife
Mr. Gayle Etheridge & Wife
Mr. Dorsey L. Turner.

Landslide &/or Settlement: August, 1957
Employers Mutual Casualty Company Policy 5092253
Lumbermens Mutual Insurance Company Policy 42–086650
St. Louis Fire & Marine Insurance Co. Policy 26596
Pacific National Fire Insurance Co. Policy 990943

"Gentlemen:

"This is to place the above named insureds on notice that the captioned insurance companies have *waivered* the following sentence in the policy contract, which is found under basic conditions, requirements in case loss occurs:

" 'Within ninety-one days after the loss, unless such time is extended in writing, the insured shall render to this company a Proof of Loss signed and sworn to by the insured.'

"This is being done in order to reassure you that the insurance company has your interest at consideration in that they realize that each of you have sustained loss that is not covered under the insurance policy contract, and are giving you the opportunity to recover your whole loss.

"Yours very truly,

"JLS/lr

R. Beach Mott & Company
(signed) Jack L. Simpson
Jack L. Simpson, Adjuster

"cc–Interested Companies"

———————◆———————

The foregoing letter as a matter of law waives the filing of proofs of loss within 91 days provided it was written by an agent authorized to write it. It is undisputed that Jack L. Simpson who signed the letter was an authorized employee of

R. Beach Mott, an independent insurance adjuster, to whom appellant assigned appellee's claim for handling, and that Mr. Mott, who represented some 200 insurance companies, including appellant, assigned appellee's claim to his said employee, Jack Simpson, for handling. The letter in question, waiving proof of loss, was identified by Mr. Mott as having been written on his letterhead and signed by Mr. Simpson. Mr. Mott testified that he assigned the files to Mr. Simpson to handle under his (Mott's) supervision and control; that he, Mott, was an approved adjuster, and worked under the instructions of insurance companies, and could think of no instance where he exceeded the instructions given him; that he was one of appellant's adjusters and had occasion to represent appellant in handling their claims in this area; that his authority to settle claims for appellant was to make investigations and report the extent and nature of damage.

He also testified that he settled claims for appellant and didn't always have to get the company's approval before settling the same; that where the loss was unquestionably covered under the policy, he would take the responsibility of accepting the proof of loss and submit it to the company with his recommendation; that he handled the proof of loss phase of the investigation; that the file in question was assigned to him by appellant and appellant had never questioned any authority assumed by him in handling any of his files, and that his entire file had been turned over to appellant's counsel, Mr. Chilton Bryan. He further testified that under his routine procedure a copy of the letter in question would have gone to appellant as the letter itself shows; that he did not recall receiving any correspondence back from appellant in regard to such letter, and if he did it would be in the file which belonged to appellant and which was turned over to appellant's counsel. Appellant's counsel did not cross-examine Mr. Mott, nor did he offer in evidence any communication from appellant questioning Mr. Mott's authority to write the letter waiving proof of loss.

■ In our opinion, the uncontroverted evidence and circumstances related above established, as a matter of law, that Mr. Mott had authority from appellant to handle and adjust the claim in question and while engaged in doing so to write by and through his employee, Mr. Simpson, the letter of waiver. National Union Fire Ins. Co., Pittsburgh, Pa. v. Richards, 290 S.W. 912, Tex.Civ.App.1927; Occidental Fire Ins. Co. v. Fort Worth Grain & Elevator Co., Tex.Civ.App., 294 S.W. 953, writ ref. 1927. See 24-B Tex.Jur., p. 691, Insurance, Sec. 344, where it is stated: "It is generally recognized that an adjuster authorized to act in the premises may waive notice and formal proofs of loss." See also Phoenix Ins. Co. v. Levy, 12 Tex.Civ.App. 95, 33 S.W. 992, Tex.Civ.App.1895; German Ins. Co. v. Norris, 11 Tex.Civ.App. 250, 32 S.W. 727, Tex.Civ.App.1895; Security Ins. Co. v. Jagoe, 247 S.W.2d 298, Tex.Civ.App. 1952.

■ We further hold that the waiver of proof of loss was conclusively established under the evidence, and that therefore the submission of waiver to the jury was not required. The interpretation of the letter of waiver was a matter for the court and not the jury. Benefit Ass'n of Ry. Employees v. O'Gorman, Tex.Civ.App., 195 S.W.2d 215, writ ref. n. r. e.

■ It will be noted that the letter of waiver was written within 91 days from the date the construction of the storm sewer began, and that such letter states that the insured had sustained loss not covered under the insurance policy contract. Mr. Mott's authority to settle claims referred to him for adjustment necessarily included the authority to refuse to settle and deny liability on the part of the company in whole or part. This he did in the letter written to appellee and the other property owners mentioned in the letter. The law

is well settled that a recovery may be had on the policy without furnishing proofs of loss where the insurance company denies liability under the terms of the policy during the period within which proofs are to be made. The denial of liability by appellant's adjuster was a denial by appellant. Such denial was in effect later approved and ratified by appellant in denying liability in the answer it filed herein. 24-B Tex. Jur., p. 686, Insurance, § 343, and numerous authorities cited.

The insurance policy in question does not insure against loss resulting from occurrences or conditions set out in Sec. II, paragraph B of Form No. 148, but such exclusion does not apply to total or partial collapse of a dwelling. Special Issue No. 2, which the jury answered in the affirmative, reads as follows:

"Do you find from a preponderance of the evidence that the plaintiff's house subsequent to June 24, 1957, suffered a partial collapse?

"Answer: 'We do.' or 'We do not.'

"In connection with the foregoing Special Issue you are instructed that the term 'partial collapse' means a sinking, bulging, cracking or pulling away of the foundation or walls and other supporting structures so as to impair their function of supporting the superstructure and tending to destroy or impair the efficiency of the dwelling as a habitation."

Appellant asserts that there is no evidence of partial collapse of appellee's house; that the jury's finding is not supported by sufficient evidence; and that the court erred in refusing to give the definition of "partial collapse" requested by it.

■ Appellant has cited a number of cases which are factually inapplicable because in such cases the policy did not use the words "partial collapse," but "collapse of the house or part thereof" or similar wording. The distinction is vital. One of the dictionary definitions of "partial" is "incomplete, not general or total." It is our view that this meaning should be given to the word "partial", and that "partial collapse" is not restricted to total collapse of a part of the building but includes any degree of collapse less than total. See United States Fidelity & Guaranty Co. v. Baker, 65 S.W.2d 344, 346, Tex.Civ.App. 1933, where "partial" is given the meaning herein ascribed to it.

■ We have neither found nor been cited to any case defining "partial collapse" of a building. It is reasonable to presume, however, that if appellant intended the words "partial collapse" to mean a collapse of a part of the building, it would have employed the language used in the cases cited by it. In Travelers Fire Insurance Co. v. Whaley, 272 F.2d 288, 291, 10th Cir.Ct. 1959, the court stated that if the appellant intended that the word "collapse" should be given the definition urged by it, it should have so stated in its policy, and that in the absence of such intent it was more realistic to define the term as connoting "a sinking, bulging, cracking, pulling away of the wall so as to impair its function of supporting the superstructure and destroying its efficiency as a habitation." The court in such case further stated that the general law is that if the policy contains a word susceptible of being construed, without violence, as having more than one meaning, the meaning most favorable to the insured must be adopted. To like effect see Southwestern Fire and Casualty Company v. Atkins, 346 S.W.2d 892, Tex.Civ. App.1961. In the Whaley case, supra, the court was defining "collapse." The definition given in the instant case, which we think is proper, is similar to the definition in the Whaley case, although slightly changed to cover "partial collapse."

■ Without reviewing all the evidence it will suffice to say that the testimony of Mr. Goodman, a consulting engineer, is

sufficient in itself to support the jury's finding. He testified that the front bedroom of the house is physically tilted 3¼ inches from the northwest to the southeast corner, the drop being approximately over a distance of ten feet; that he believed it indicated the foundation of the house had failed by subsiding 3¼ inches; that on the east wall of the bedroom the sheetrock was cracked completely through approximately ¼ inch extending diagonally from the corner of the window to the baseboard; that door frames were deformed; that in the back bedroom there was a sloping of 1⅞ inch; that it represented a settling of the foundation under that part of the house and produced some severe cracks in the sheetrock over closet doors in the south wall, and that the living room was sloping ⅝ inch and the front door of the house was deformed, requiring that it be trimmed ½ inch to make it close. He concluded that the foundation of the house had actually physically settled, particularly along the east wall, approximately 3 inches. He did not believe the concrete foundation could stand a deflection of such magnitude without breaking, or that there was any way of physically restoring the foundation to its original condition. There is also evidence that there is a pulling apart of the baseboard from the floor of the house as much as ½ inch in places, and that the floor of the garage, which is on the same slab as the house, had sunk in the middle where the cracks were most prevalent.

We have concluded in the light of the entire record that the jury's finding that appellee's house has suffered a partial collapse as defined in the court's charge is not against the great weight and preponderance of the evidence.

Appellant also complains of Special Issue 1–A, which is based upon an exclusion contained in said Paragraph B and reads as follows:

"Was the damage, if any, to the plaintiff's house which occurred subsequent to June 24, 1957, the result of normal settling, shrinkage or expansion in foundations, walls, floors or ceilings?

"If you find from a preponderance of the evidence that such damage, if any, was not caused by normal settling, shrinkage or expansion in foundations, walls, floors, or ceilings, let your answer be, 'It was not the result of normal settling.' Otherwise, let your answer be, 'It was the result of normal settling.'

"In connection with the foregoing Special Issue, you are instructed that the term 'normal settling' means a sinking or subsidence caused by usual or regular conditions, as distinct from abnormal (that is, unusual or irregular) conditions.

"To which the jury answered: 'It was not the result of normal settling.'"

We do not agree with appellant that Special Issue 1–A and the form of the answer required by the court, restricted the jury to a consideration of only normal or abnormal settling of foundations, walls, floors or ceilings. The issue as worded placed upon appellee the burden of negativing the entire exclusion, and not merely normal settling. It is true that the court might have defined "normal" instead of "normal settling," but we do not think that the jury could have been misled into thinking that the issue referred only to normal settling, when the court expressly instructed the jury that if it found from a preponderance of the evidence that the damage was not caused by normal settling, shrinkage or expansion, they would answer it was not the result of normal settling, otherwise they would answer it was the result of normal settling. The jury was sufficiently instructed as to the meaning of normal as something caused by usual or regular conditions as distinct from abnor-

mal or something caused by unusual or irregular conditions.

■ The court did not err in refusing to give the requested Issues F to M, inclusive, submitted by appellant. These issues were either not raised by any evidence or were adequately covered by the issue given. The court having submitted a controlling issue made by the pleadings and evidence, was not required to submit separately the fractional parts of such issue or various phases or different shades thereof. Rule 279, Texas Rules of Civil Procedure. The issue is worded in the language of the exclusion pled by appellant and, if there was any error in connection with such issue and the instructions given or in the refusal of the court to give appellant's requested issues, we cannot say that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure.

Judgment affirmed.

On Motion for Rehearing

■ We are cognizant of the rule mentioned by appellant in its motion for rehearing, that a reviewing court will not permit a judgment to stand when a defendant is denied the right to a separate submission of a vital defense issue, even though it cannot be said under Rule 434, Texas Rules of Civil Procedure, that error in refusing to submit such issue probably resulted in the rendition of an improper judgment. In such case harm will be presumed. Texas & Pac. Ry. Co. v. Van Zandt, Tex.Sup. 1958, 159 Tex. 178, 317 S.W.2d 528. In the last paragraph of our opinion, we did not mean to say or hold anything contrary to such rule. We have reviewed appellant's requested Issues F to M, inclusive, and reaffirm that such issues were either not raised by any evidence or were adequately covered by the issues submitted by the trial court.

Motion for rehearing overruled.