NO. 07-04-0577-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



JANUARY 12, 2005


______________________________



In re WILLIAM CLIFTON McELHANEY, 



 Relator

_________________________________



Original Proceeding


_______________________________



Before QUINN, REAVIS and CAMPBELL, JJ.

 Pending before the court is the petition for a writ of mandamus filed by William
Clifton McElhaney. Through it, he requests that we order the judge of the 251st District
Court to vacate his order denying McElhaney's motion to dismiss the petition in a suit
affecting the parent-child relationship filed by the real parties-in-interest (Gloria Kay Rawls
and Raymond Leigh Rawls, the maternal grandparents of the minor child) for lack of
standing and to compel the trial court to enter an order dismissing the suit. For the reasons
discussed below, we deny the petition. 

 A grandparent has standing to file an original suit requesting managing
conservatorship of a minor child when "the order requested is necessary because the
child's environment presents a serious question concerning the child's physical health or
welfare." Tex. Fam. Code Ann. §102.004(a)(1) (Vernon 2002). (1) Furthermore, abusive or
violent conduct as well as drug-related criminal activity by a parent can support a
conclusion that a child's physical or emotional well-being is being endangered. In re D.C.,
128 S.W.3d 707, 715-16 (Tex. App.-Fort Worth 2004, no pet.). 

 Here, evidence of record discloses that McElhaney's five-year-old child had lived
with the child's paternal grandmother since he was about six months old. When she died
in January of 2004, the child went to live with McElhaney and McElhaney's sister for
several weeks. During that time, McElhaney allegedly assaulted his sister, who then called
both the police and Child Protective Services. Evidence indicated that he previously had
assaulted his wife and had a "real bad temper." After the assault upon McElhaney's sister,
the child went to live with the Rawls. The parties eventually agreed that McElhaney could
regain custody of the youth if, among other things, he underwent periodic drug testing (i.e.
hair follicle testing and urinalysis) and the results of those tests were negative. The
agreement later was memorialized in a temporary court order. 

 Though McElhaney alleged that he ceased using methamphetamine on January 1,
2004, he nevertheless failed his first hair follicle test. Furthermore, when asked to undergo
a urinalysis per the temporary order and on 24 hours notice, it took five days for him to
appear and comply. He did pass that test, however.

 That he failed the hair follicle test and delayed the urinalysis for five days is some
evidence from which the trial court could reasonably question whether McElhaney had
stopped taking drugs. This, coupled with the evidence of relator's temper and assaults
upon his wife and sister, provided basis for the trial court to conclude that serious questions
regarding the child's physical health or welfare existed if McElhaney was allowed to regain
custody of the child. At the very least, questions of fact existed concerning the child's
safety and welfare, and because they did, we cannot grant mandamus. See In re Trinity
Universal Ins. Co., 64 S.W.3d 463, 466 (Tex. App.-Amarillo 2001, orig. proceeding)
(holding that an appellate court cannot resolve questions of fact in an original mandamus
proceeding). 

 Accordingly, the petition for a writ of mandamus is denied.


 Brian Quinn 

 Justice 

 
1. Relator interjects the element of immediacy into the test by suggesting that there must be an
immediate concern for the child's safety or welfare. Though that indicia originally appeared in §11.03(b)(1)
of the Texas Family Code, the word was removed when the statute was recodified into §102.004(a)(1) of the
same code. Given that the legislature excluded the term from the recodification, we must hold that it intended
to excise the need for immediacy from the equation. See Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535,
540 (Tex. 1981) (stating that "we believe every word excluded from a statute must . . . be presumed to have
been excluded for a purpose"). So, because Von Behren v. Von Behren, 800 S.W.2d 919 (Tex. App.-San
Antonio 1990, writ denied), a case cited by the Relator for the proposition that there must also be an
immediate concern for the child's welfare, involved §11.03(b)(1) as opposed to §102.004(a)(1), it is not
controlling. 



Failure to Give Notice 

 The first issue before us concerns whether the trial court erred in granting summary
judgment on the question of whether conditions precedent went unsatisfied. The Fields
alleged that Brighton failed to perform a condition precedent to the legitimate formation of
a pooling unit. The condition involved written notification by mail to them of its actual
designation of the acreage pooled. All agree that Brighton did not mail notice of same to
the Fields group as required by the lease agreement. Nevertheless, Brighton argued that
the requirement was either waived or that the Fields group was estopped from invoking it. 
The trial court apparently agreed since it concluded that the failure to comply with the lease
provision did not prevent the 643-acre pooling unit from coming into effect. We find that
there is a genuine issue of material fact as to the matter and sustain the issue.

 The standard for review of a traditional summary judgment motion is well settled and
need not be reiterated. Instead, we cite the parties to Nixon v. Mr. Property Management
Co., 690 S.W.2d 546 (Tex. 1985) and Kimber v. Sideris, 8 S.W.3d 672 (Tex. App.-Amarillo
1999, no pet.) for an explanation of it. Moreover, any doubt as to whether a genuine issue
of material fact exists so as to defeat summary judgment should be resolved in favor of the
non-movant. Kimber v. Sideris, 8 S.W.3d at 675. And, when both sides move for
summary judgment and the trial court grants one motion and denies the other, we review
the evidence presented by all movants and determine all dispositive questions presented. 
Bradley v. State ex rel. White, 990 S.W.2d 245, 247 (Tex. 1999). 

 Next, it is clear that a lessee has no right to pool minerals unless it is expressly
granted by the lessor. Tittizer v. Union Gas Corp., 171 S.W.3d 857, 860 (Tex. 2005). 
Similarly unquestionable is the rule that the validity of an effort to pool depends upon
compliance with the specified methods and purposes contained in the lease. Id.

 Here, the Fields and Waterfield leases contained the following provision:

 . . . . Lessee's election to form a pooled unit shall not become effective until
Lessee files for record in any county in which all or part of the pooled
acreage is located an instrument describing and designating such pooled
gas leasehold estate, either before or after the commencement or
completion of a well thereon or the commencement of production of gas
therefrom, and the mailing of a copy of the same to Lessor. 

 

Again, no one disputes that the instrument executed by Brighton "describing and
designating such pooled gas leasehold estate" was filed as required but not mailed to the
lessors. Thus, a provision upon which the validity of the pooling agreement was dependent
did not occur. This circumstance would normally render the lessee's effort to pool invalid.

 Yet, as lessee, Brighton and the Waterfields raised the specters of waiver and
estoppel. They contend that the Fields knew of Brighton's intent to pool the tracts of land
for purposes of drilling a gas well, said nothing of the mailing requirement until suit was
filed, executed a document purporting to reform the unit to 320 acres, and accepted partial
royalty payments. Thus, the requirement that a copy of the instrument be mailed to them
did not bar the pooling effort of Brighton from taking effect.

 Waiver is an intentional relinquishment of a known right or intentional conduct
inconsistent with claiming that right. United States Fidelity & Guaranty Co. v. Bimco Iron
& Metal Corp., 464 S.W.2d 353, 357 (Tex. 1971); Continental Casing Corp. v. Siderca
Corp., 38 S.W.3d 782, 789 (Tex. App.-Houston [14th Dist.] 2001, no pet.). It can occur by
expressly renouncing a known right or by silence or inaction for so long a period as to
evince an intent to yield a known right. Continental Casing Corp. v. Siderca Corp., 38
S.W.3d at 789. As can be seen, all is dependent upon intent, and for an implied waiver
to arise, that intent must be clearly demonstrated by the surrounding facts and
circumstances. Motor Vehicle Bd. of the Texas DOT v. El Paso Indep. Auto Dealers Ass'n,
Inc., 1 S.W.3d 108, 111 (Tex. 1999); see also Robinson v. Robinson, 961 S.W.2d 292, 299
(Tex. App.-Houston [1st Dist.] 1997, no writ) (holding that the court may look at the acts,
words, or conduct of the parties and it must be unequivocally manifested that it is the intent
of the party to no longer assert the right). Though waiver may be a question of law if the
facts involved are clear and undisputed, see Sedona Contracting, Inc. v. Ford, Powell &
Carson, Inc., 995 S.W.2d 192, 195 (Tex. App.- San Antonio 1999, pet. denied), it is a
question of fact for the factfinder to resolve if the evidence on the matter conflicts. Straus
v. Kirby Court Corp., 909 S.W.2d 105, 108 (Tex. App.-Houston [14th Dist.] 1995, writ
denied). So too is it a question of fact when it is a matter of inferring the requisite intent. 
Robinson v. Robinson, 961 S.W.2d at 300. 

 It is undisputed that the Fields executed a lease amendment, did not complain of
the failure to receive notice prior to the dispute arising, executed a reformation of the unit
as part of a proposed settlement, and received royalties on their uncontested 433/643
portion of the well production. However, evidence appears of record indicating that 1) the
Fields did eventually invoke the requirement, 2) the purported effort to reform the unit was
invalid, and 3) the Fields were entitled to royalties from the production of minerals under
the lease irrespective of the validity of Brighton's pooling effort. 

 Also part of the summary judgment record was an original and a supplemental
affidavit executed by Ronald D. Nickum, the attorney who represented the Fields viz 
Brighton and the lease. In them, he admits agreeing to amend the lease, but states, "I did
not agree to waive, abandon, modify, or amend any other provision of the FIELDS-MAHLER acreage." He also stated:

 As the attorney for FIELDS-MAHLER who caused the lease amendment to
be executed by my clients, I had no intent to waive the right of mailed notice
nor was my conduct (and that of my clients based on my recommendation
to sign the lease amendment) . . . inconsistent with claiming the right of
mailed notice of pooling. At the time that I prepared the original oil and gas
lease from FIELDS-MAHLER to BRIGHTON, I knew that its acreage constituted less than
640 acres, that some of the lands on its borders [were] held by production and not
available to be leased or pooled with it, I knew that the producing wells in the vicinity were
gas wells which had been drilled to the formation commonly called the Morrow formation,
and I knew that the Morrow formation required a 640 acre proration unit for production of
natural gas. I knew that there was a possibility that the acreage would be pooled with
Waterfield acreage to the west to support a gas well (if Brighton was successful in finding
the Morrow zone). Knowing all of this, I still felt it necessary to include in the original lease
contractual pooling provisions requiring mailed notice of pooling. When the leases were
amended, that didn't change my thinking at all. . . . There was no discussion of the mailing
requirement between me and any Brighton representative. 


 . . . The mailing requirement has to do with giving actual notice to the lessors
of the entire contents of the unit designation. I learned the importance of
receiving a copy of the unit designation for completed wells as a result of
practicing law in the oil and gas area. The requirement enables me to know
for certain that the lease is finally and effectively pooled with other lands and
it provides a written document for my file upon which I can calculate royalty
due to my clients. That is an important piece of information for my flies [sic]
that I can use along with the records I am entitled to receive from the lessee
under Paragraph 7(b) of the lease to independently confirm that the well is
a gas well, that it is properly pooled as to the acreage covered by my clients
[sic] lease, and it enables me to review division orders that come to my
clients. . . . 


 . . . It was never my intention to delete a condition precedent as to one
issue - - - formal notice of the pooling - - - by agreement to amend the lease
as to another issue - - - acreage tolerance. . . . 


 While evidence appears of record illustrating that Brighton's failure to mail the requisite
notice did not stop the parties from proceeding with drilling effort, there is also evidence
indicating that the notice provision was not meant to be waived. Nor can it be legitimately
said that knowledge of Brighton's intent to pool sufficed to illustrate waiver. Knowing that
someone intends to do something is quite different than knowing that they actually did it. 
The former involves information about something that has yet to and may not happen,
while the latter contemplates notice of something that has occurred and is historically
immutable. At the very least, the evidentiary record contained some evidence sufficient
to create a material issue of fact as to waiver, especially since the purported waiver would
be implied from conduct as opposed to expressed. Thus, the trial court could not
conclude, as a matter of law, that the Fields waived the requirement.

 Nor can we say that acceptance of royalty payments by the Fields was enough, as
a matter of law, to prove estoppel. Again, the Fields were entitled to payment for the
minerals being taken from their land per the lease with Brighton. See Atkinson Gas Co.
v. Albrecht, 878 S.W.2d 236, 240 (Tex. App.-Corpus Christi 1994, writ denied)
(recognizing that one is not necessarily estopped from claiming that a lease terminated
though he accepted royalties tendered under the lease). One accepting what he is entitled
to under any circumstance and without indication that he relinquishes the remainder falls
short of illustrating the consistent positions that must arise for there to be an estoppel. 

 In short, the summary judgment record does not establish as a matter of law that
the Fields waived their right to mailed notice or were estopped from invoking the provision. 
Consequently, the trial court was obligated to submit the issues to trial and resolution by
a factfinder. Since it did not, it erred.

 Because the remaining issues do not entitle the Fields to greater than that afforded
by our resolution of issue one, we need not consider them. Accordingly, the judgment is
reversed and the cause remanded for further proceedings.


 Brian Quinn

 Chief Justice






 


1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2005). 
2. Brighton filed an "Appellant's Brief" but states that it did so "not to directly challenge the judgment
of the trial court, but rather to preserve error and permit this Court to either affirm the trial court's judgment
or reverse and render, so that this continuing controversy may be finally resolved without a remand."